Schlafly, Judge Jolly, Judge King, Judge Costa, I'm Andrew Schlafly, and I represent Appellants Stephen F. Hotze, M.D., who is here in the courtroom today, and Braidwood Management, Inc., which he founded and which employs about 73 employees, which subjects it to the employer mandate under the Patient Protection and Affordable Care Act. Article I, Section 7 of the U.S. Constitution states that, quote, all bills for raising revenue shall originate in the House of Representatives. The Constitution then allows the Senate to concur or propose amendments to those bills. The origination clause was very important to the framers of the Constitution, and it's important today. It maximizes political accountability for revenue-raising bills. It makes sure that if a bill is going to raise revenue, it can only start in the entity that has the maximum accountability to the people, the House of Representatives. The House of Representatives is elected every two years. It's the only body where you have to be elected to be a member of the body. The origination clause dates back hundreds of years before the Constitution. It was discussed and debated during the ratification conventions. Why don't we get to the point of this case? The point of the case, Your Honor, is that ACCA was passed in violation of the origination clause because ACCA is a revenue-raising bill that did not originate as a revenue-raising bill in the House of Representatives. All right. Can you tell us why it's a revenue-raising bill? Yes, Your Honor. It's a revenue-raising bill because it imposed billions of dollars in taxes, because the Supreme Court upheld ACCA in NFIB only because it's a tax, only by finding it as a tax. It's not sustainable under the Commerce Clause. Why don't you tell us how you handle the theory that rests on Justice Story's statement, the theory of primary purpose? Justice Story did not describe it as divining the primary purpose of a bill, which is, of course, very hard to do. I'm not sure what that means, primary purpose. What Justice Story said is if a bill is regulatory in nature, if it's addressing some other constitutional power, if it's passed pursuant to some other constitutional authority, and it incidentally raises revenue for that program, such as national currency, such as a rail station in D.C., such as a post office. So, if the bill is designed to initiate a program or expand a program under some other constitutional authority. Okay. Now, why is that not the case here? Because there is no other constitutional authority for ACCA. The Supreme Court's held that. It's not sustainable under the Commerce Clause. It's only sustainable as a tax. And we have a Fifth Circuit precedent that we need to follow here, which is Texas Office of Public Council, Public Utility Council versus FCC, which said that you can only avoid the strictures of the Origination Clause if courts establish some relationship between the payers and the beneficiaries. And in those other cases where the Origination Clause was avoided by the courts, it's because the money that came in was designed to go to the beneficiaries of the program, such as a victim. Are you arguing, in your case, accepting the primary purpose theory? Are you rejecting it? I don't think the primary purpose theory is good law. I don't—there's nothing that I'm aware of that— How do you get away from the fact that the Fifth Circuit itself has said that the Supreme Court has instructed us to apply the primary purpose doctrine in determining these tax questions? What the Fifth Circuit said is that the Origination Clause applies unless courts establish a relationship between the payers and the beneficiaries. That's the Texas Office of Public Utility Council case. And that doesn't exist here. The taxes that are paid under ACCA go into the General Treasury of the United States and do not go to the beneficiaries of the program. So under controlling Fifth Circuit precedent, Origination Clause has to be applied here because there is not that relationship between the taxes that are paid in, billions of dollars, we're talking about medical device taxes— Why don't we disagree with you on that and we say, look, I mean, the primary purpose of this statute clearly is—primary purpose is not to raise revenue, but the primary purpose of it is to provide health. Now that—and if we come—if we're going to analyze it under primary purpose, that's the way we're going to argue it. Now how do you—how would you deconstruct that position? Well, Your Honor, with all due respect, I don't think that's the law in the Fifth Circuit, divining what the primary purpose is. I'm not sure what that means. Does that mean that everyone who voted for it voted for it? Assuming that we are persuaded of what I've just said, how do you deconstruct our conclusion? Well, in that case, I would say that there is no stated primary purpose for the employer mandate, which is what this case is about. This is an employer we're talking about, and the imposition of the employer mandate tax does not have a stated primary purpose in the bill, and the district court recognized that. I would point out— Since this case is about the employer mandate, isn't there a jurisdictional issue, which is the application of the Anti-Tax Injunction Act? And in the NFIB case that went to the Supreme Court, the Supreme Court said, well, that statute doesn't bar the suit because Congress didn't label the individual mandate as a tax. But here, Congress quite clearly, at least in a couple instances, did call the employer mandate a tax. So why under NFIB, which makes Congress' designation seemingly dispositive, why doesn't the Anti-Tax Injunction Act bar your case, at least as it goes to the employer mandate? Judge Costa, the rationale for the Supreme Court and how it determined that the individual mandate could be upheld as a tax would carry over to the employer mandate, in that it's a tax for the purpose of analysis under the Constitution, but it would not be a tax for the purpose of the Anti-Injunction Act. In other words— Even though Congress called this a tax when it didn't call the individual mandate a tax? Even though they called it that, the Supreme Court indicated that the intent of Congress was not to immunize this legislation from challenge under the Anti-Injunction Act, and the Fourth Circuit has held that way also. They looked at the same question. They looked at a challenge under the employer mandate in the Liberty University case, and they said, no, we're not going to step back and say there's not jurisdiction simply because this is a challenge under the employer mandate rather than the individual mandate. I mean, both those mandates are part of the same bill. The Supreme Court has looked at it and said this is reviewable. So that's my response. Well, let's say we do think you can't challenge the employer mandate because of that statute. You have Mr. Hotze as an individual plaintiff challenging the individual mandate, which I guess—explain to me why Mr. Hotze, who as I understand it right now has employer-provided coverage, which means you're not subject to the individual mandate. How does he have standing? I mean, in other words, what's the likelihood that he's—I think you have to show he's going to incur the individual mandate at some point. Plaintiff Hotze—I refer to him as Dr. Hotze because he is an M.D. and he's a practicing physician. He has to make a choice whether to go under the employer-provided plan that's ACCA-compliant and give up some of the freedom that he has now. And one of the freedoms that he gives up is that when he goes under the ACCA-compliant employer-provided plan, he can no longer buy vitamins with his HSA account. Previously, before ACCA, a patient could purchase vitamins out of their HSA account. ACCA says you can only purchase vitamins out of your HSA account if you have a prescription for them. So he loses certain rights by going under the employer-provided plan. But so he can—there's all kinds of other plans he could buy as an individual. I mean, you have to show, first of all, I guess he's not going to like his new employer plan, so he's going to decide not to use it. And then instead of buying all the other insurance you can buy out there in the private market, he's going to decide just not to be insured and face the individual mandate. I mean, that seems like a lot of contingencies when, for standing, an injury has to be imminent, doesn't it? Well, it is imminent, though, because he would prefer to be with the employer-provided plan. That's what he has been in the past. And before ACCA, under the employer plan, he was able to purchase vitamins out of his HSA account. But now if ACCA is imposed and we're not able to enjoin it here, then he loses something. He's injured. So his injury is not being able to use the HSA for these pills. It's not that he's going to have to pay the individual mandate? Is that how you're— Well, he's— I mean, every American is going to maybe pay higher or lower premiums. I mean, there's all this political debate, get worse or better coverage. It seems to me by that theory any American who's covered by an employer health plan could spring this lawsuit. Maybe that's your position. Maybe that's the law. But that seems standing usually has to be a little more particularized than that. Well, the lawsuit applies to millions of Americans, so anyone who's injured by the lawsuit. And he is faced with this choice now that he didn't have before ACCA was imposed. And so he either goes under the employer plan and gives up his ability to buy vitamins without a prescription, or he faces paying the individual mandate tax. What essentially, as I understand—you can demonstrate for a moment— is that standing of the individual is tied precisely to the injury that the employer suffers. Because if the employer suffers, that injury is passed on down to the employee, those choices that he's got to make one way or the other, as a result of whatever happens to the employer he's providing insurance to begin with. To the extent he would have preferred to have stayed with the employer plan outside of ACCA, but now the employer is being pushed under ACCA. The employer says, now I'm going to have to comply with the statute. I'm going to have to provide higher-cost insurance, and it's going to cost you more. Then he's got to make a decision. Am I going to stay with this plan, or am I going to the individual plan? And then he goes to the individual plan and says, I really don't think I want any, and I'm going to have to pay the penalty, all as a result of having the statute imposed on him. But at some point, that gets very abstract and hypothetical. And the question is whether that's any kind of real and concrete injury that he's suffering at this time of the lawsuit. Well, the district court established standing and found standing based on the employer. On what? Based on the employer. So that's the posture on appeal where the district court said, I find that the employer has standing, and therefore the district court said I don't need to inquire whether Dr. Hotze also has standing because once one party has standing, then all the parties. It's easier for the employer to have standing, but the employer has this Anti-Tax Injunction Act issue. That's why if we thought Hotze had standing, it would really avoid the whole tax injunction statute. Well, I'd submit that Dr. Hotze has standing as much as the plaintiffs and NFIB had standing. I mean, the court resolved the NFIB litigation without avoiding it on standing grounds. I would like to address. On the merits, I have one other question. You argue that the House bill, which was the service member's home ownership tax, you're saying that wasn't a revenue bill, so any Senate amendments don't matter because it didn't start as a revenue bill, and you say that's because it was revenue decreasing, it was a tax credit rather than revenue raising. What case law supports that view? Because there's a lot of cases out there, I don't think from the Fifth Circuit, but from other circuits saying we don't get into whether it's going to raise revenue or decrease as long as it's revenue related, it's a revenue bill. Well, what happened below was actually the government tacitly conceded that the House bill was not revenue raising. So they did not assert below any argument initially that the House bill was revenue raising. So once they conceded that, I didn't argue it further in response. But I will say that what the- Why did Judge Atlas treat it as a revenue bill that the Senate- I mean, she had the alternative holding that even if this is a revenue bill, it started as one in the House, it was properly amended, so it's okay. Well, I think what she really said was that not because it was revenue raising in the House, but that because it started in the House. It seemed to me her reason was just because it started in the House, it could have been anything. And then the Senate amended it. Therefore, that becomes a revenue raising bill that originated in the House. That was what I took from her decision. I thought everyone agrees it has to- even if the Senate amends it, it has to originate as a revenue bill. That's my position. And I believe that because the House bill waived taxes, it wasn't a tax cut. It actually waived tax obligations. And I don't see any argument and I don't think there's any precedent that waiving tax obligations is revenue raising. Okay, Mr. Shafferly, you've turned the red light on for us. Thank you. Mr. Katz, you represent an amicus. Yes, I represent the members of Congress who, as amici, are supporting reversal. May it please the Court, the Affordable Care Act satisfies any conceivable test on bill for raising revenue. It satisfies the test established by the Supreme Court in Munoz-Flores because the revenues raised by the Affordable Care Act go into the Treasury and fund general operations of the government. That's in stark contrast to every other case distinguished in Munoz-Flores, which involve revenues that are specifically earmarked for particular government programs. It also independently satisfies the test established by this Court in the Texas public utility case because the exaction of revenue under the Affordable Care Act has no connection between the payers and the beneficiaries. And under Texas utility, that's independently sufficient to make it a bill for raising revenue. Third, it satisfies the historical test laid out by Justice Story and then repeatedly quoted in all of the cases. Justice Story says that a bill for raising revenue is something that levies a tax in the strict sense of the word. The Affordable Care Act levies taxes. Justice Story distinguishes tax bills from other non-tax bills that incidentally create revenue. And he gives examples of those. He says it's not a revenue-raising bill if the government establishes a post office and that independently— What's curious to me is that even after NFIB, Chief Justice Roberts found that the individual mandate was a tax, that holds the individual mandate. But forget the individual mandate. There are billions of dollars in taxes in this bill. So why did this lawsuit and the D.C. lawsuit only come about after the individual mandate was held to be a tax? I mean, why didn't anyone think this was an origination clause problem before that? And going to your clients, why didn't your clients use the internal House mechanism of returning a blue slip when a House member thinks the Senate has violated the origination clause? I mean, this isn't some bill that no one was paying attention to. It's one of the most high-profile, controversial bills in decades. One of the most high-profile bills in decades, to the extent people were focused on the individual mandate. Remember, it came up as a mandate and was only re-characterized as a tax by the Chief Justice on avoidance grounds. But in any event, yes, there could have been blue slips presented, and they weren't. Members of Congress aren't always omniscient. They don't always have perfect political courage. But in Munoz-Flores— In other instances, this very Congress— Oh, sure. —had less significant bills where they returned that blue slip. I mean, it does seem to me— Sure. I know the Supreme Court's held it justiciable. But if your argument is this is so obviously a revenue bill, why wasn't it obvious to the 200 or so members of Congress and of the House who didn't like the bill? Judge Costa, they actually said a little bit more than that. In the political question portion of Munoz-Flores, they said the fact that the House could enforce the Origination Clause and chooses not to doesn't somehow prevent judicial review or skew judicial review when the case comes up in an Article III case or controversy and you have a plaintiff who's injured by a statute that he claims violates the Origination Clause. So, yes, shame on us. We could have raised it at the time through a blue slip process, and we didn't. That doesn't affect your obligation under Munoz-Flores to apply your best judgment applying the governing standards. And we are here, admittedly, belatedly, but we have 90 members who are now pressing that view upon you. The district court created an unprecedented regulatory purpose exemption from the Origination Clause. They said any time a tax—the court said any time a tax can be supported by a regulatory purpose, the Origination Clause doesn't apply. Very troubling because regulatory purposes are often present and easy to assert. So the district court's rationale would make vast swaths of taxes wholly exempt from the Origination Clause. Take a look at the tax code. Take a look at Subtitles D and E of Title 26. You will find all sorts of taxes that have regulatory purposes. Alcohol, tobacco, machine guns, green mail, coal, gambling, all sorts of things where there's a plausible regulatory purpose. The effect of this is to create a large range of taxes wholly not subject to the Origination Clause. There's no history that supports such a narrow reading of that. At the Constitutional Convention, one of the formulations of the Origination Clause was raising money, quote, for the purpose of revenue, close quote, which arguably would provide some support for the district court's standard, but that was excised. It didn't pass in that way. It passed as a bill for raising revenue, which was understood to be coextensive with the Article I, Section 8 power of Congress to raise taxes, duties, imposts, and excises. Looking at the second part of the clause, if you're looking at the original understanding, weren't proposals that gave the Senate a much narrower amendment power rejected in favor of this power to let the Senate amend revenue bills as it does in other areas? Okay, so on the as in other bills point, and then I want to come back to structure and history, but let me address your question first. I think the most natural reading of that is that they wanted to incorporate the amendment power known to the framers at the time. The amendment power known to the framers at the time was the one that governed the Articles of Confederation Congress from the beginning of the country under the Articles. Most of the framers had served, many of them had served in Congress under the Articles of Confederation, and that Congress operated under an amendment rule prohibiting non-germane amendments. So when they say amendments as on other bills, our view is they're incorporating that traditional standard, which has the virtue of preserving the fundamental distinction between the power to originate and the power to amend. I'm turning to text now. That seems like a very tough concept to define. It seems like our circuit in the Texas Association of Concerned Taxpayers case says, subject matter appears to merely require that both the amendment and the amended portion address revenue collection. But how would, I mean, in addition to the problem there's that precedent out there, how would you set up a germaneness standard? Germaneness involves the Senate changing the subject of the bill. Now, that is obviously a question of degree. It's obviously— But wouldn't you say that in this case you don't have to define germane because they obliterated— Exactly. If any case tests the limits, this is it. We have the House-originated bill was a laser-sharp tax credit for service members who choose to buy homes, and it comes back as 17 tax increases projected by CBO to raise hundreds of billions of dollars, all of which go into the Treasury. Something like a bill, 2,000 words, and it turns out it's 60,000. Right. This is— Isn't it the same shell bill procedure at issue, though, with the 1982 tax bill that resulted in this Court's opinion? Yeah. Complete gutting, the shell bill is what they call it. Well, it's not just that they gut in the sense of replace the bill. You have to look at what the House puts in play versus what the Senate comes back with. In terms of your— The House bill can be completely gutted and still be germane amendments in the Senate. Exactly. If this bill—if this substitute is germane, then any substitute is germane. And the fundamental problem with that is it equates the amendment power to the origination rule. And if one thing is— It obliterates the origination provision of the Constitution. Yeah. That's absolutely right. And if one thing is clear from text and structure and history, whatever amendment means, right, it can't be coextensive with the power to originate, because what the framers did not say was the House or the Senate can originate revenue bills, and that's the upshot of what happens here. But the House still has the power to originate. Without that origination of a revenue bill, the Senate can't do anything. The House has the power to originate, but what's the practical bite of that on the Senate? The Senate doesn't start with the House bill and make some degree of modifications. It starts with its own bill. And then the only thing it has to do is pluck a completely unrelated House bill out of the— The House can refuse to pass that Senate bill. And that's the argument against our position asserted and rejected in Munos Flores. The fact that the House chooses not to enforce a germaneness limit doesn't mean that this Court can't or shouldn't. To the extent history matters, the amendment power came in for two very narrow purposes. When the amendment power was first put into the origination clause, they were worried that they didn't want to force the Senate to reject bills for any minor technical problem, and they were worried that the House would abuse its power by tacking non-revenue bills onto—non-revenue provisions onto revenue bills, and thus putting the Senate in a position where they have to make an all-or-nothing judgment, not just on revenue bills, but on non-revenue bills. None of those historical justifications supports an amendment power that equates to the origination power and thus renders one of the fundamental structural protections in the Constitution entirely ineffective. Unless the Court has questions, I thank you for hearing us out and request that the judgment be reversed. Thank you, Mr. Katsas. Now we'll hear from Ms. Klein, representing the Department of Justice. May it please the Court. Elisa Klein for the Department of Justice. I'd like to pick up where the conversation left off, but just to flag that we do believe the Anti-Injunction Act bars the employer's claim, and we've set out the reasons in our brief, so just don't want to have that lost by addressing the merits. And Dr. Hotze is not like the plaintiffs in the NFIB. They submitted affidavits that showed that they did not have health coverage, whereas he has health coverage that satisfies 5000A. So just as we recall, I know the Court knows this, the way the Affordable Care Act was passed, the House originated the bill. All of the provisions concerned revenue. Some of them were tax relief provisions, waivers. Others were tax penalties for not filing tax returns, an increase in estimated taxes. All of this was referred to the Joint Committee of Taxation, which made predictions. This was the vehicle that then the Senate deliberately chose and amended and substituted the Affordable Care Act. Went back to the House, which passed it. No origination. There was a projection made at some point that this thing was going to be a revenue producer in the House, right? Correct. The Joint Committee of... A net producer. Correct. For the House-originated bill. And we provide the citations. The projection was that it would... When you say the House-originated bill... In its original form. In its original form, the one that related to veterans or whoever it was. An increased tax penalties for not filing certain income tax returns and increased the estimated tax due by corporations. Right. Yes. We're talking about the one that was completely gutted. Yes, I'm talking about the House-originated bill. The House bill that came to the Senate and by amendment was completely gutted. Yes, and I'm going to return to the question of why did no one in the House or Senate regard this legislation as presenting an origination clause problem. So nobody questions the fact that the amended statute was a tax bill that originated in the House of Representatives, as I understand it. I mean, the question is simply whether that bill that originated in the House and came to the Senate by amendment can stand as a revenue bill originated in the House when it is completely gutted. And this was exactly the procedure used with TEFRA and was litigated... TEFRA, what... ...the Tax Equity and Fiscal Responsibility Act of 1982. That's, you know, this Court's decision that... What is the name of that decision? The decision... Fifth Circuit. ...referred to as the Fifth Circuit case is Texas Association of Concerned Taxpayers and recited in every... ...and then was filled with tax revenue raising matters that were germane to the ones that were in the original bill. Germane only in the sense, as this Court said, that both the House-originated bill had measures that related to revenue, as did the Senate bill. In fact, I pulled our Fifth Circuit brief out of curiosity to see what we said, and it said the House-originated bill. So the first one, it was called the Miscellaneous Revenue Act, and it had deductions for business use of homes. It defined personal holding companies subject to a surtax, imposed a penalty on taxpayers that filed privilege... ...there is absolutely nothing, as I understand it, you can tell me whether or not what your argument is, but there is nothing in the amended Senate bill that is germane to the House bill that originated in the House. I'll read what this Court said on germaneness. So it said, you know, that the substitution, you know, what's called gutted and replaced, was... I had to ask a question, and I meant to ask a question. I may have misheard. And that was, do you accept the fact that there is nothing in the Senate bill, in the bill that's amended by the Senate, that is germane to the content of the bill that was amended, originated in the House? No, the district court correctly held that the provisions of the Affordable Care Act, you know, counsel says there were 20 that concerned taxes, were germane to the provisions that concerned taxes in the House-originated bill in exactly the same sense, in the same level of generality. Germane only in the sense that they were a tax. Is that what you're saying? In the sense this Court, I'll read from this Court. When the challenge to TEFRA was squarely foreclosed by Flint, that's the Supreme Court's 1911 decision, in which the Senate's substitution of a corporation tax for a House-drafted inheritance tax was upheld by the Supreme Court, which stated that the amendment was germane to the subject matter of the bill and not beyond the power of the Senate to propose. And this is the important sentence. Subject matter appears to merely require that both the amendment and the amended portion address revenue collection, citing all of the other Court of Appeals cases that reach the same conclusion. And so ever since, and indeed before, to make sure there can be no origination clause issue because- Now, if we adopted that view that you can gut and replace a bill like that with completely new measures, does not effectively eliminate the origination clause in the House. Okay. This is, of course, not a new principle, and the House regards- I'm asking you how. In other words, if we adopt that point of view, it seems to me that the origination clause off the Constitution has no meaning. No. The House gets to go first, and it has to set things in motion by passing a revenue bill. Yeah, but they can take any revenue bill that they want that comes from the House and switch it into anything they want it to. And that was recognized at the time of the framing, and again, by all of the courts who addressed TEFRA, and the Supreme Court in Flint said it doesn't matter that the House-originated measure was an inheritance tax. You're saying, yes, this has the effect, as I understand your answer to my question, yes, this has the effect of at least severely crippling the origination clause, if not obliterating it. Again, this has been the rule for all of time. The House still vigorously protects its prerogatives because going first, if the House passes a revenue bill that the Senate just wants to pass, it's not a vehicle for other legislation. The House has much more control influence because it gets to decide, do I pass a revenue bill, and do I pass one that can become a vehicle for different legislation? If the Senate wants to pass what the House sent over, then that just gets enacted. Well, that seems to me that you're acknowledging, then, that the Affordable Care Act is a revenue bill. No, and so I'll come to the second. That's what you said. Now, I said that in an abundance of caution because the Senate didn't know exactly what was going to even go into the Affordable Care Act. It has hundreds of provisions, and so to make sure that there could be no origination clause issue, they took the House revenue bill and used that as the vehicle, just as they did in TEFRA and the fiscal cliff legislation and the Tax Reform Act of 1982, and, you know, there's a measure going back to 1883. Yes, and so that way you can be comfortable, and, in fact, even though the House members who opposed the legislation stood up one after another on March 20th and March 21st, 2010, and said the Affordable Care Act raised taxes, not one said this implicates the origination clause because they all understood that the House did its part. It went first. It passed. It originated a revenue bill, and that triggers the Senate's amendment power, which is coextensive with its power to amend any other type of bill. Once the House goes, the Senate's power is not limited in terms of the scope or substance of the amendments. I have a question on this first merits issue of whether this is, in fact, a revenue bill. The government tries to just focus on whether the individual mandate or the employer mandate is revenue-related. That's what the D.C. Circuit did. But it seems to me I understand for jurisdiction they have to target the specific provision that affects them, but if they can get over those jurisdictional issues, isn't the question whether the bill, which is all of it, all the taxes, whether that's a bill for raising revenue? I don't see how we can just say is this particular subsection when the Constitution says is it a bill for raising revenue, but are you saying we can only look at whether the individual mandate or employer mandate raises revenue? Yes, I understand the question, but I looked at the way the Supreme Court analyzed, to the extent the Supreme Court was looking at this precise issue. So Munoz-Flores, it looked at, I think it was 18 U.S.C. 3013, one provision of a much, much larger piece of legislation, and it just said was that assessment a, quote, bill for raising revenue? And the Ninth Circuit had said that explicitly in the decision on review in the Supreme Court. Were there revenues in that bill? I mean, wasn't that mainly a crime bill? No, but again, the Affordable Care Act, a lot of it is insurance regulation, hospital regulation. So the claim here is— I'm saying why don't we look at all of it and say is it a bill for raising revenue? I mean, you seem, when you're relying on purpose, I think you were trying to, in part, look at the overall bill. So in looking at whether it's a bill for raising revenue, don't we have to look at all the taxes? No, what the Supreme Court did—so again, I'll use Munoz-Flores. It looked at the 3013 assessment in light of its purposes, so informed by related provisions. It didn't look—there were three titles to the legislation of Munoz-Flores. Two of them were totally irrelevant to the assessment, and it looked to the crime control provisions that informed what's the purpose of this assessment. So I understand linguistically when you say bill, you might think it's the whole thing, but that was not how the Supreme Court in any of the cases approached the inquiry. So again, going to the way the D.C. Circuit, which did not have controlling TEFRA precedent, looked at it, it is also, of course, open to the Court to look at— So, I mean, I suppose your answer to Judge Costa means that when we look to the Affordable Care Act, we don't look to the general purpose of the act, but to the general purpose of the provisions relating to the mandate and to the tax-related provisions. That is how the Supreme Court has looked at it. So it would be looking to, again, assuming standing, 5000A for Dr. Hobson. If that is true, then how do you handle the characteristics that the tax has of levying a tax collected by the Internal Revenue Service, regulations directed and formed and promulgated by the Internal Revenue Service, penalized by the Internal Revenue Service, like any other tax? So how do you handle that? Now, for purposes of the Anti-Injunction Act, that is all relevant, and it does demonstrate that unlike 5000A, the 4980H employer tax is just like any other tax that you have to pay and then— But my question is not so much—is not how you handle it on the Anti-Injunction Act, but how do you handle that in terms of the origination clause? Well, the purpose, if we're now talking about the employer tax, is to encourage employers to provide health coverage. Its purpose would be served best if zero revenue were collected. It's just like 5000A, the individual coverage provision, and I don't believe that is contested. There's an argument that purpose doesn't matter. I do not believe that the plaintiff or Plaintiff Zemecki have disputed the district court's conclusion that the purpose of these provisions— that the purpose of the bill—that we focus solely on the provisions that collect the taxes for the bill and not the entire bill. That was your answer to—as I understood it, your answer to Judge Costa. Correct answer. Okay. Wait a minute. Just a minute. And that the general purpose of the statute didn't matter. It was the provisions that you were focusing on. If that is true, then, it seems to me that you are giving up completely any argument based upon the reading, the particular interpretation of Justice Story, that a general purpose doctrine saves this Affordable Care Act. No, Your Honor. The question properly addressed by the D.C. Circuit was the purpose of the provision. So, the Supreme Court and NFIB addressed the purpose of the tax penalty in the individual coverage provision and said it's to encourage people to have health insurance. It's not to collect revenue. Okay. Okay. So, when we look to the general purpose, to which—referring back to Justice Story—we're saying that the general purpose is not the health care that it's providing for the nation, but it's the general purpose of the tax revenue-producing sections of that bill. I believe I'm agreeing, but just to be clear. So, 5000A, you know, Dr. Hotz is challenging the individual coverage provision. The Supreme Court there very explicitly said the purpose of imposing the tax penalty is to encourage people to have health insurance. The employer—the purpose, as discussed by the district court in this case, is to encourage employers to give their employees health coverage. It's not to raise money. Congress's purpose is accomplished if all large employers provide health coverage, not if they pay the penalty. I think that's where I would see it. Unless the Court has further questions, I'll yield. Okay. Well, thank you, Ms. Kline. Thank you. Yes, indeed. And Ms. Wydra, is it? Thank you, Your Honors. May it please the Court, Elizabeth Wydra for Amiki Curiai, Senator Ron Wyden, chair of the Senate Finance Committee, and Congressman Sandy Levin, ranking member of the House Ways and Means Committee and chair of that committee at the time that the Affordable Care Act was enacted. Your Honors, regardless of whether or not the challenge provisions of the Affordable Care Act are considered to be revenue-raising and triggering the requirements of the Origination Clause, the fact is that the requirements of the Origination Clause were nonetheless met in this case. H.R. 3590, the Service Members Homeowners Tax Act, was a revenue-raising bill that unquestionably originated in the House, and the Senate's amendment of that House-originated bill was within its constitutional authority under the Origination Clause. With respect to H.R. 3590, it is within the heartland of what this Court has considered and what the Supreme Court has considered to be a revenue-raising bill. It clearly relates to taxes. The entire bill is about amending the Internal Revenue Code. The House and the Senate have long agreed that bills that relate to taxes and that are not merely tax-increasing, as Your Honor, Judge Costa was engaged in a dialogue with my friend on the other side earlier, the House and the Senate have long agreed that bills that relate to taxes, whether they be increases or decreases, count as bills for raising revenue. And this Court said much the same in the TEFRA case. It makes sense that this would be the general rule because a definition of revenue-raising bills that focus solely on the outcome of the tax provisions will be difficult to implement because some members of Congress might disagree over the overall effect on the collection of taxes, or the provisions might have varying effects over different years. That's why this Court's sister circuit in Armstrong squarely held that the term bills for raising revenue does not refer only to laws increasing taxes, but instead refers to all laws relating to taxes. So under that standard, which the House and Senate have both agreed upon, H.R. 3590 was unquestionably a bill for raising revenue that properly originated in the House. Now getting to the second half of the origination clause, we submit that the Senate's amendment of H.R. 3590 was properly within its constitutional authority. The text of the Constitution plainly says that the Senate may amend revenue bills as it may amend other bills. And from the time that Thomas Jefferson wrote the first Senate Parliamentary Manual, this sort of strike and replace or shell bill type of amendment has been used by the Senate on other bills. And therefore, under the plain text of the Constitution, the Senate should have the authority to amend revenue bills in the same manner. I know there's that Jefferson statement. I think you have some from the Virginia ratifying convention saying people thought this was going to happen and was allowed. But the plain text of amend, I mean, doesn't amend mean add, delete, but not do away with entirely and start fresh? I mean, you think amend supports that? Your Honor, I think that that is the balance that the framers struck. They certainly had before them the example of the House of Lords and the English system, where there was this much more limited power to amend, a very limited power to amend. And instead, they consciously chose to allow the Senate to amend as on other bills. And the fact is that since the time of the founding, this sort of shell bill procedure has been the way that the Senate has amended other bills and other revenue bills as well. And the House and the Senate have, you know, tussled over this from time to time. There was this exchange in 1871 and 1872 about this. And the House and the Senate agreed after that, and it has become long-settled legislative practice, that this sort of amendment process is consistent with the Origination Clause. And as the Supreme Court has recently explained, particularly when courts are interpreting what could be ambiguous constitutional provisions that relate to the workings of the elected branches, courts should hesitate to dislodge those compromises and working arrangements that the elected branches themselves have come to. And in this case, both the House and the Senate believe that the strike and replace amendment procedure is consistent with the Origination Clause. And I would respectfully disagree with my colleagues that this renders the Origination Clause a dead letter. Clearly, we see that the House continues to vigorously protect its prerogatives under the Origination Clause. In the 111th Congress in particular, in which the Affordable Care Act was enacted, there were half a dozen blue-slip resolutions, although, notably, not one filed with respect to this particular legislation. But there were, nonetheless, blue-slip provisions filed that successfully returned bills back to the Senate. This shows that the Origination Clause and the House under that clause still vigorously protects its institutional prerogatives. And that's not even taking into account the less formal ways that the House has of vigorously preserving its prerogatives under the clause. Sometimes, if a bill comes from the Senate, the House parliamentarian will flag it for the Ways and Means Committee, and they'll sort of, you know, without having to resort to a blue slip, you know, work that out with the Senate. So the Origination Clause continues to be something that is alive and well in the House, and under these accepted legislative understandings that allow the strike-and-replace sort of amendment that the Senate used in this case. Well, let me ask you about the contradiction between the individual mandate and the employer mandate, given the opinion of Justice Roberts that the individual mandate was not a tax subject to the Anti-Injunction Act. I mean, how do we, given the Supreme Court has said that, how do we with a straight face say, well, I mean, we treat the employer tax, employer mandate differently, and this sounds like a discombobulated application or interpretation of the Affordable Care Act. I mean, that doesn't make a lot of sense to me, frankly. So, Your Honor, that is an excellent question. My clients have entered this case solely on the second ground of the district court's ruling, in order to give the court their expertise and experience as committee leaders of the congressional committees that traditionally have worked to preserve the institutional prerogatives of both the House and the Senate when it comes to the origination clause. That was a nice way to answer it. That is an excellent question, but I'm not going to answer it. But my clients representing both the House and the Senate and their continued work to preserve the institutional prerogatives of both chambers under the origination clause submit to the court that however it rules on the question of whether or not the Affordable Care Act provisions challenged in this case trigger the requirements of the clause, they are unquestionably met in this case. And if I have a moment, I just wanted to speak briefly to the conversation about a germaneness requirement. So the Senate has never considered itself to be bound by a requirement of germaneness, which is directly relevant under the text of the Constitution because it says that the Senate shall amend, has the power to amend revenue bills as it may amend other bills. And the Senate has not considered itself bound to be limited to a germaneness required on other bills. And so if the court were to impose some sort of germaneness requirement, it would be contrary to the text of the origination clause. I would also submit that it would be, as Your Honor raised in speaking with my friend on the other side, difficult to define such a limitation for the Senate if it were to require anything more than sort of the loose germaneness requirement that was suggested in this court's TEFRA case. The, you know, as Mr. Katz has conceded, it is a matter of degree, even the germaneness requirement that he is suggesting. And that sort of we know it when we see it type of standard would be very difficult for the Senate to legislate under. Are you saying then that there's no germaneness requirement of any kind? Your Honor, certainly the Senate has not considered itself bound to a germaneness requirement. Of any kind? No. Well, I should say under certain circumstances, such as when cloture is invoked, there is a germaneness requirement. But that's sort of a legislative — I'm talking about with respect to the — with respect to amending a bill that comes from the House. No, it has not. And, in fact — It's revenue. If we're in the origination clause world, the germaneness is they both have to be revenue. Right. So which essentially is just sort of — Are you conceding that? I think that this Court has suggested that there is the subject matter requirement that both have to relate to revenue. But presumably you wouldn't be in the origination clause world if you didn't have a revenue measure from the House and the Senate. So you are conceding that there has to be at least the germaneness that it relates to revenue? Your Honor, my clients would not agree that the Senate legislatively has a germaneness requirement. Of any kind? That is correct. Okay. Thank you very much. Thank you. I believe we have some time for rebuttal. Mr. Chalafy. Thank you, Your Honor. I'd like to address the purpose issue first. It's inconsistent with the language of the origination clause to say that the Congress can get around it by stating some purpose that's other than raising revenue. It's inconsistent with our Fifth Circuit precedent to hold that Congress can get around the origination clause just by stating some other purpose. And the amici that just spoke said right in their brief that purpose is not part of the origination clause. And they quote Elliott's debates right here on page 10 of her brief. First, it, referring to the origination clause, applied to all bills for raising revenue regardless whether the bill was, quote, for the purpose of revenue. Purpose is not part of the origination clause. Didn't she just say that? Well, she said it had to have something to do with revenue regardless of the purpose. I think that, no, I think that. The Senate takes a position that there's no germaneness requirement. The cases, I think, well, that might work, what she said, but the cases indicate that they do, as Judge King says, have to have. A revenue component. And I think that was what she said, but we can listen at length to what she said. And ACCA does have a revenue component. And I might add, if ACCA is going to be held to be outside of the origination clause based on some sort of purpose, it has to be a constitutional purpose. It can't be a purpose that's outside the power of Congress. And I cite a case, Butler, for that proposition. You can't sustain the constitutionality of a bill based on a purpose that's outside the authority of Congress. Congress couldn't put a policeman on every street corner. But NFIB said Congress could, through the taxing power, impose the individual mandate. Justice Roberts, Chief Justice Roberts said often taxes are meant for regulatory reasons. And so why do you say it was outside of the Constitution? He said that, Judge Costa, but he also said, of course, this tax must comply with other parts of the Constitution, such as the origination clause. He didn't say the origination clause, but he said other parts of the Constitution. That would include the origination clause. So if it complies with the origination clause, but it doesn't comply with the origination clause. It just doesn't. It came out of the Senate. And respectfully, I urge you not to accept the argument that's been presented by the government that the Senate can take any House revenue bill, of which there are thousands, every session, and simply gut and replace that with a massive, highly controversial revenue-raising bill. Because what that does is it avoids the political accountability that the origination clause ensures. The origination clause is for the people, in addition to being for the House. It's protection of the people. And the framers, such as James Madison, promised us that it would protect against the Senate doing exactly what they did with ACCA. He promised us that in the Federalist Papers. He said, no, we've got the origination clause in there. The House controls the purse. And that's how the Constitution was passed.  It hasn't been taught much in law schools recently, obviously. I hadn't heard about it until I got involved in this case and so on. But you go back to those debates, it was a big issue. And it goes back to the Magna Carta. That's the protection, because that's where the accountability is. And if you gut the origination clause and allow the Senate to take any House bill and stuff in some highly controversial revenue-raising provision, then you deprive the people of that safeguard. Well, then you put it back to the Senate. But the—yes, Judge King.  And really what you're saying is that we should, in what we do, act to protect the minority members of the House. Is that really what you're asking? I'm asking Judge King to protect the people against the trick that the Senate pulled. And the Senate is not as politically accountable to the people. You say it's a trick and it's an expansion of the Senate's power. But going back to the Flint case from the Supreme Court, there there was an inheritance tax that the House had passed. The Senate gutted the inheritance tax and instituted the first corporate income tax. That's a big deal. I mean, you say the Affordable Care Act's a big deal. I agree it is. But so was creating a corporate income tax. That was a big deal, completely different than inheritance tax. The Supreme Court said, OK, how is that—how is the change from the House to Senate bill here more substantial than in Flint? Well, I would respectfully submit that replacing the inheritance tax, which is going to be controversial with the people, with a corporate tax, which is probably going to be less controversial with the people, is not as big a deal as what the Senate did in replacing a credit for servicemen with a massive revenue-raising provision. We have to gauge how controversial. Well, I don't think—and I also submit that Flint, that holding of Flint may not have survived Munoz-Flores, where Munoz-Flores has some pretty good language for our side, where they say this origination clause is just as important as the First Amendment. OK, I think your time has expired, Mr. Sheffield. Thank you, Your Honor. Thank you.